**In re CHARRINGTON WORLDWIDE ENTERPRISES, INC., d/b/a Keppie Travel Bureau, Debtor.**

**Bankruptcy No. 88–7619–8P1.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 7, 1989.

David L. Woodward, Dallas, Tex., for Debtor.

Robert Wahl, St. Petersburg, Fla., for movant.

ORDER ON EMERGENCY MOTION FOR RELIEF FROM STAY OR ALTERNATIVELY FOR ADEQUATE PROTECTION OR ALTERNATIVELY MOTION TO COMPEL ASSUMPTION OR REJECTION OF EXECUTORY CONTRACT AND MOTION TO PROHIBIT THE USE OF CASH COLLATERAL

ALEXANDER L. PASKAY, Chief Judge.

THIS is · a Chapter 11 reorganization case, and the matter under consideration is

an emergency motion filed on February 14, 1989, by Airlines Reporting Corporation (ARC). In its motion, ARC seeks several reliefs in the alternative. First, a relief from the automatic stay; second, in the alternative for adequate protection; third, an Order to Compel the Debtor to assume or to reject an executory contract; fourth, an Order to Prohibit the Debtors the use of cash collateral. In light of the apparent emergency of the relief sought by ARC, this Court attempted to schedule a hearing at once, but inasmuch as counsel for the Debtor was enroute to Texas, it was not possible to arrange an actual hearing. In lieu, this Court arranged a telephonic conference with counsel of the Debtor, at the conclusion of which it was agreed that the hearing would be reset for February 22, 1989, to receive evidence and oral argument in support of and in opposition to the relief sought by the Motion filed by ARC.

The facts as appear from the record and from additional evidence presented at the hearing are as follows.

ARC is a Delaware corporation maintaining its principal place of business in Washington, D.C. The stockholders of ARC are the participating domestic scheduled airline carriers. ARC was organized for the purpose of acting as a clearing house for airline tickets sold by travel agents with whom ARC enters into a contract entitled, "Agent Reporting Agreement" (Agreement) (ARC's Exh. No. 1). Under this Agreement, ARC furnishes to the designated travel agent on behalf of the participating carriers blank traffic documents and airline identification plates. Under this arrangement, the travel agent is authorized to sell airline tickets by writing the ticket on a traffic document and by imprinting the airline plate and name of the travel agent on the traffic document. The customer pays the travel agent for the ticket, who in turn is required to file a weekly sales report to ARC. The reporting period commences on Monday and ends at midnight the following Sunday. The sales report must be furnished by the travel agent to ARC the Tuesday following the end of the reporting period. The Agreement further requires the travel agent to maintain a bank account in a designated banking institution and to maintain funds in that bank account sufficient to cover a draft which ARC is entitled to present for collection ten days after the closing date of the reporting period, i.e., the second Tuesday following the end of the reporting period. The Agreement further provides that the travel agent must maintain a bond running in favor of ARC in an amount sufficient to protect ARC in the event there is a default by the travel agent.

On February 2, 1988, ARC and Charrington Worldwide Enterprises, Inc., d/b/a Keppie Travel Bureau (Debtor), entered into the Agreement just described (ARC Exh. No. 1). Pursuant to this Agreement, ARC furnished the Debtor with travel documents and airline identification plates and authorized the Debtor on behalf of the participating carriers to sell airline travel tickets to the public at large. It appears that ARC itself had an agreement with the participating carriers entitled, "Carrier Service Agreement" (ARC's Exh. No. 2). Under this agreement, ARC was required to remit to the carrier on whose behalf the Debtor sold tickets to customers on the tenth day following the reporting period, that is, the same day when ARC under its contract with the travel agent is entitled to present its draft on the bank account maintained by the travel agent. The obligation of ARC to pay the carrier which honored the tickets sold by the Debtor during the reporting period is absolute and does not depend on whether or not the draft presented for collection by ARC was honored by the bank where the Debtor maintained his bank account.

It is without dispute that pursuant to the Agreement, ARC presented for collection several drafts drawn on the bank account maintained by the Debtor which were dishonored by the bank for insufficient funds. The details of the dishonored drafts are as follows:

| DATE OF DRAFT | FOR SALES WEEK ENDING | AMOUNT | REASON | EXH. NO. |
|---|---|---|---|---|
| 11/16/88 | 11/06/88 | $9,186.51 | Insufficient | A |
| 11/23/88 | 11/13/88 | 1,872.94 | " | B |
| 11/23/88 | 11/13/88 | 167.02 | " | C |
| 12/07/88 | 11/27/88 | 115.69 | " | D |
| 12/14/88 | 12/04/88 | 134.10 | " | E |
| 12/28/88 | 12/18/88 | 527.13 | " | F |
| 12/28/88 | 12/18/88 | 5,399.95 | " | G |

Accordingly, it is without dispute that presently there is due and owing to ARC $17,403.34 (See Affidavit of John J. McHugh).

The Agreement also required the Debtor to maintain a bond in an amount which was determined by the average ticket sales made by the Debtor. In the present instance, the Debtor did obtain a bond from Hartford Accident and Indemnity Company (Hartford) running in favor of ARC in the principal amount of $50,000. The Agreement also provides that travel documents and the carrier identification plates are deemed to remain the properties of the carriers and which shall be surrendered by the travel agent upon default (XI(d)) of the Agreement (ARC Exh. No. 1).

The Debtor filed its Voluntary Petition for Relief under Chapter 11 on December 15, 1988. As noted earlier, according to the last sales report submitted by the Debtor to ARC, there was an outstanding balance in favor of ARC in the total amount of $17,403.34. Inasmuch as the Petition was filed in the middle of the reporting period, i.e., on Thursday, it is impossible to determine at this time what portion of the amount outstanding is attributable to sales made before the filing date and what portion should be attributed to postpetition sales. It now appears without dispute that the bond written by Hartford on behalf of the Debtor was cancelled and Hartford no longer acts as surety for the Debtor (See Affidavit of Anthony F. Lynch). Although it was intimated by the Debtor that there was an outstanding letter of credit which is a satisfactory substitute for the bond, the Debtor was not able to present any evidence to support this proposition, and in any event, it appears that the letter of credit mentioned was issued in favor of Hartford, and not in favor of ARC. Basically, these are the salient facts which appear from this record based on which it is the contention of ARC that it is entitled to several alternative reliefs requested by its Motion under consideration.

It should be noted at the outset that the Motion as presented does not really put in issue the Debtor's ability to assume this executory contract as a matter of law, although in the body of the Motion, it is claimed that this executory contract between ARC and the Debtor is a contract to extend financial accommodation to the Debtor, therefore, pursuant to § 365(c)(2), the Debtor cannot assume this Agreement as a matter of law.

Obviously, the threshold question which must be resolved before considering anything else is whether or not the Agreement, i.e., the contract between ARC and the Debtor is a type of executory contract which is non-assumable by virtue of § 365(c). This Section, inter alia, provides as follows:

§ 365(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

A plain reading of this Section indicates that executory contracts to make a loan or extend other debt financing or financial accommodation are not assumable. The legislative history of this Section indicates that the characterization of contracts to make a loan or to extend credit or

debt financing was intended to be limited to actual extension of cash or the extension of a line of credit and was not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time. The legislative history of this Section leaves no doubt that this exception to the assumability of executory contracts was drafted for the purpose of assuring that contracts to lend money or to extend credit which involves always a trust and confidence akin to personal contracts should not be assumable without the consent of the other party to the contract.

There is authority to support the proposition that § 365(c)(2) applies only to contracts to extend credit to grant a loan, to grant debt financing or financial accommodations, and certainly not to all contracts which involve the extension of credit. As stated in *2 Collier on Bankruptcy*, § 365.05[1] at 365/44 (15th Ed.1988), "These terms are to be strictly construed and do not extend to an ordinary contract to provide goods or services that has incidental financial accommodation or extension of credit."

■ It is not surprising that courts which considered this question are far from agreement. This Court had the opportunity earlier to consider this question in the case of *In the Matter of Wills Travel Service, Inc., d/b/a Wills World of Travel*, 72 B.R. 380 (M.D.Fla.1987) where this Court concluded that the ARC Agreement, the same as involved in this case, was assumable and was not the type of executory contract contemplated by § 365(c)(2) of the Bankruptcy Code. ARC, in order to overcome this Court's conclusion in *Wills*, points out that in *Wills*, there was no evidence presented; that under the Carrier Agreement (ARC's Exh. No. 2) between ARC and the participating carriers, it had absolute obligation to remit to the carrier the amount attributable to tickets sold by the travel agent during the previous reporting period, which was honored by the carrier, less the commission earned by the travel agent. Based on the foregoing, it is now the contention of ARC that this Court should reconsider its conclusion arrived at in *Wills* and accept the proposition urged by ARC that its contract with the Debtor was, in fact, a contract to furnish financial accommodation with ARC and, therefore, would not be assumable by virtue of § 365(c)(2). ARC also relies on the case of *In re Lockspur, Inc.*, 82 B.R. 37 (Bkrtcy.E.D.La.1987), in which the court concluded that the ARC Agreement, the same Agreement involved in this case, was held to be an executory contract to extend financial accommodation to the Debtor and, therefore, could not be assumed. ARC also cites a case yet to be reported, *In re C.I.F. Travel & Tours Corporation*, Case No. 3-8-04030-TC, decided by the bankruptcy court for the Northern District of California on February 14, 1989. The Court in *Lockspur*, without any analysis, stated that the ARC reporting agreement was, in fact, a contract to extend financial accommodation, thus, not assumable. However, the real holding of *Lockspur*, was not based on the assumability of the ARC Agreement, but on the specific findings that the debtor involved in *Lockspur*, was not able to cure, or to provide adequate assurance that he would promptly cure, prepetition defaults, and the court was also satisfied the debtor was unable to assure future performance. Based on the facts in that case, the court also concluded that the debtor was unable to carry the burden to establish that it is able to provide adequate protection to ARC. A close reading of *Lockspur*, leaves no doubt that the court has really ruled on the debtor's inability to meet the requirements of § 365(b)(1)(A), (B), (C) for assumption and did, in fact, tacitly and indirectly recognize that the ARC Agreement was in fact assumable, but not by the particular debtor involved in *Lockspur* for the reasons stated. This conclusion is, of course, inescapable simply because if the ARC contract was not assumable, one would not ever consider § 365(b) on the Debtor's ability to furnish adequate protection.

ARC also cites the case of *In re Adana Mortgage Bankers, Inc.*, 12 B.R. 977 (Bankr.N.D.Ga.1980) and *In re Postle Enterprises, Inc.*, 48 B.R. 721 (Bankr.D.Arz 1985) cited by ARC in *Wills*, earlier. Nei-

ther *Adana,* nor *Postle,* are analogous to this case and do not furnish any support for the proposition urged by ARC. *Adana,* involved a guaranty agreement which clearly created an obligation to pay money on the obligation of others. So did *Postle,* which involved a commercial lease under which the landlord was required to pay substantial funds to accomplish some structural improvement on the leased premises for the tenant. Oddly enough, the same bankruptcy court, but a different judge of that court, in the case of *Karsh Travel, Inc. v. Airlines Reporting Corp.,* 87 B.R. 110 (Bankrtcy.N.D.Cal.1988), which decided *C.I.F. Travel and Tours Corporation,* concluded that an ARC contract, the same as involved in this instance, was not a contract for extension of financing, to loan money or a contract of financial accommodation, therefore, it was assumable by the debtor. The court in *Karsh Travel,* considered *Lockspur,* and *Wills,* and adopted the ruling of this court in *Wills.* Furthermore, the court pointed out that while the blank ticket stock furnished to the travel agent by ARC no doubt has value and may be readily converted to cash, this alone did not turn the Agreement between ARC and the travel agent into an obligation to grant the loan, to extend credit or to furnish financial accommodation to ARC. The court in *Karsh Travel,* also relied on an important policy consideration in rejecting the position urged by ARC, a policy which is a basic underlying principle of any rehabilitation chapter of the Bankruptcy Code. In this connection, *Karsh Travel,* points out that an independent travel agency is unable to function without the ARC Agreement, and if a travel agent which might be in default under its agreement with ARC would be at once deprived of the use of travel documents and the carrier identification plates, it would be out of business at once, and would be effectively precluded to seek and achieve rehabilitation under Chapter 11. The case *In re The Travel Shoppe, Inc., d/b/a World Explorers,* 88 B.R. 466 (Bkrtcy.N.D.Ga.1988), which is the latest known decision on this subject, is also in agreement with *Wills,* and concludes that to interpret the ARC contract as a contract

to furnish financial accommodation just because there is a possibility the debtor does not make sufficient deposits from the sales on time, would turn every contract into a financial accommodation contract where a debtor owes any money to a claimant from whom it obtained either goods or services. As stated by the court, this would "allow the exception to swallow the rule", citing *In re United Press International, Inc.,* 55 B.R. 63, 66 (Bankr.D.C.1985); *In re Farrell,* 79 B.R. 300, 304 (S.D. Ohio 1987).

To further bolster its argument, ARC points out that under its Agreement with the travel agent, travel documents and the carrier identification plates are not property of the estate (XI(d) of the ARC Agreement). The reference to this provision when one closely analyzes the same, is really a non sequitur and lacks any persuasive power. The situation concerning the travel documents and the carrier identification plates are no different from any other items furnished by a franchisor to a franchisee in connection with the franchise agreement. For instance, let us assume that under the Holiday Inn franchise, the franchisor furnishes to the franchisee the necessary equipment to participate in a central reservation system maintained by the franchisor. No one can argue that the equipment was at all times, and at all times remains, the property of the franchisor. Yet it would be absurd to accept the proposition that while the franchisee may assume a non-terminated franchise agreement pursuant to § 365, the franchisor may repossess the equipment which is indispensable and without which the franchisee is unable to actively operate its hotel facility as a Holiday Inn franchise. Just because the travel documents have a value does not change the picture. Neither does the fact that the carrier identification plates without doubt were and still are properties of the carriers. This is so because obviously if this Court concludes that this is an assumable executory contract, it is clear that the travel agent would not be able to function as a travel agent as it will be deprived of the use of the travel documents and carrier identification plates. This does not mean, however, that since the

travel documents themselves represent an economic value, and they are easily transformable into cash or money, that ARC is not entitled to appropriate measures which would adequately protect its interest.

Based on the foregoing, having concluded that the ARC Agreement is an executory contract which could be assumed under § 365 by the Debtor and not the type of contract which would be within the exception of § 365(c)(2), one still must consider the balance of the reliefs sought by the Debtor which are: 1) request to order the Debtor to promptly assume or reject its contract with ARC; 2) in the alternative, to obtain relief from the automatic stay or to receive adequate protection; or 3) an order prohibiting the Debtor to use the cash collateral. Considering this last proposition first, it is clear that there is no cash collateral involved in this factual situation in a conventional sense. The term, "cash collateral" as defined in § 363(a) means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and other entities have an interest. It is evident that the Debtor has no proprietary interest in the travel documents or in the carrier identification plates simply because they were, and still are, and at all times remain the properties of the carrier. It is equally clear that the cash collected by the Debtor from the sale of the tickets and deposited in the account is not cash collateral because ARC has no specific vested interest in those funds deposited by the Debtor except to the extent that it is entitled to have sufficient funds on deposit when it presents its draft ten days after the end of each reporting period. Thus, if on that date there are sufficient funds on deposit, deposits made by the Debtor which may not necessarily be the funds obtained from sales of tickets, but, for instance, from a bank loan. Evidently it should not make any difference to ARC where the monies come from so long as its drafts are honored. It is clear that the Debtor may without restriction use the funds in that bank account for any purpose, provided it maintains sufficient funds on the day the draft is presented. From the foregoing, it

should be clear that ARC has no cognizable interest, legal or equitable, in the funds deposited in the account. Based on the foregoing, its request to prohibit use of cash collateral is without merit and cannot be granted.

This leaves for consideration the remainder of the relief sought by ARC, which is an order directing the Debtor to assume or reject the ARC contract, lift the stay or receive adequate protection. Considering the request to compel the Debtor to assume, it is clear that his relief sought by ARC is meritorious and should be granted, and the Debtor should be required promptly without delay to file a Motion to Assume this executory contract and be prepared to comply with all the conditions precedent for the assumability of an executory contract required by § 365(b)(1)(A), (B), (C). In the interim ARC is also entitled to adequate protection that the Debtor shall immediately post a bond in favor of ARC in a minimum amount of $50,000. The suggestion of the Debtor that the so-called "lockbox" arrangement would serve this purpose is unrealistic and unacceptable, and is not a suitable protective device in this situation simply because this argument is effective only in collection of accounts receivables which are encumbered in favor of a secured party.

Based on the foregoing, it is

ORDERED, ADJUDGED AND DECREED that the ARC Agent Reporting Agreement is an assumable contract; that the Debtor shall file a Motion to Assume the same seven (7) days from the date of the entry of this Order, which Motion shall be scheduled for hearing without delay at which time the Debtor shall present competent evidence that is able and willing to comply with the requirements of § 365(b)(1)(A), (B), (C); that the Debtor shall furnish a bond running in favor of ARC written by an acceptable surety in a principal amount of not less than $50,000, not later than seven (7) days from the date of the entry of this Order, and the Debtor shall fully comply with the reporting requirements of the ARC Agreement and deposit sufficient funds by the tenth day

following the end of the reporting period in its bank account to assure that the drafts presented by ARC for collection are honored. It is further

ORDERED, ADJUDGED AND DECREED that in the event the Debtor defaults and fails to comply with any of the provisions presented in this Order, ARC shall be entitled to present an Affidavit of Default to afford any and all additional relief which it deems appropriate.

DONE AND ORDERED.